IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 16, 2008

**IN THE MATTER OF S.H.**

**Appeal from the Juvenile Court for Davidson County**
**No. 2004-004350    Betty Adams Green, Judge**

---

**No. M2007-01718-COA-R3-PT - Filed April 30, 2008**

---

Father appeals the trial court's termination of his parental rights to his three-year old daughter. Based upon the record that included persistent violent behavior directed at the child's mother, we conclude the trial court did not err in terminating Father's rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., and RICHARD H. DINKINS, JJ., joined.

Nick Perenich, Nashville, Tennessee, for the appellant, W.H.

Robert E. Cooper, Jr., Attorney General and Reporter; Lauren S. Lamberth, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Thomas H. Miller, Guardian ad litem, Nashville, Tennessee Pro Se.

**OPINION**

On January 30, 2007, the Department of Children's Services ("DCS" or "Department") filed a petition to terminate the parental rights of Father and Mother to their daughter, S.H., born in December of 2004. Father and Mother were married at the time of the birth of S.H. The trial court terminated both Mother's and Father's parental rights in the same order. Mother did not appeal this ruling, so this appeal concerns solely whether the trial court erred in terminating Father's parental rights.

S.H. had been in Department custody since January 14, 2005 based on a probable cause finding of dependency and neglect in an Emergency Protective Custody Order such that it was contrary to S.H.'s welfare that she remain in the custody of her parents/caretakers. The record indicates that Mother tested positive for cocaine at the time of S.H.'s birth in December of 2004. Father was incarcerated at the time. Since Mother tested positive for drugs at the time the child was born, the DCS case worker obtained the agreement of Mother and the grandmother that grandmother

take S.H. as a "safety placement." After determining the grandmother was an appropriate placement, S.H. left the hospital in her grandmother's care.

The grandmother called the DCS caseworker shortly thereafter. She could no longer keep S.H. due to Mother's threatening and abusive behavior. The Emergency Protective Custody Order was then entered on January 14, 2005. Father was at the subsequent preliminary hearing on January 18, 2005 represented by counsel. The record contains Family Service Decree Notes wherein the Juvenile Court Referee made findings that S.H. should remain in the department's custody. Father appeared at an April 18, 2005 hearing accompanied by counsel. At that hearing, both parents agreed to S.H. remaining in DCS custody due to Father having recently served 13 years in jail and having no residence or means to support S.H. and to Mother having admitted use of illegal drugs.

The initial Permanency Plan, dated February 3, 2005, provides that the permanency goal was reunification of S.H. with her parents or placement with family. The 2005 Permanency Plan discussed several actions that Father must take prior to reunification. Father agreed to a parenting assessment and to follow any resulting recommendations, submission to drug tests, to obtain employment and to provide financially for S.H., and to successfully complete domestic violence classes. The plan notes that Father had "an extensive arrest record" and had been incarcerated. The plan also required that Father not incur future criminal charges. The plan also contained the following notation concerning actions to be undertaken by Father:

> An evidentiary [hearing] may be necessary in regards to [Father's] ability to parent due to his 18 year sentence for Assault w/intent to Commit 1st Degree Murder upon a victim who was less than 18 years old.

Father's expected achievement date of these requirements was February 3, 2006.[1] Father participated in the plan staffing but his signature line provides "advised not to sign." Father signed an acknowledgment on February 3, 2005 that he received a copy of Criteria and Procedures for Termination of Parental Rights and that its contents had been explained to him. The trial court approved the plan on April 19, 2005. On September 19, 2005, Father was ordered to pay $204 per month in child support for S.H.[2]

The revised Permanency Plan dated February 30, 2006[3] changed the permanency goal to adoption with the following reason being provided:

---

[1] The plan provided the achievement date was "02/03/05" but that is clearly a typographical error since the plan is dated 02/03/05. The achievement date for Mother's goals was "02/03/06."

[2] Father denies he received a copy of this order, yet the record reflects that Father received a copy of the petition requesting a support order and the order itself shows Father was served a copy of the order by mail.

[3] For reasons not provided in the record, the 2006 revised Permanency Plan was not approved by the court until over a year later, on April 2, 2007, although the juvenile court referee approved the plan on March 7, 2006.

Child has been in custody for over a year and mom was kicked out [of] drug court. Her whereabouts are unknown. The father is no longer at his Halfway House and his whereabouts are unknown. Put simply, the court cannot continue with a goal of reunification if the parents' whereabouts are unknown.

The Juvenile Court Referee noted in a Family Service Decree Note Form that Father was sent a notice of the plan staffing at his last known address but did not appear at that staffing. Since the whereabouts of the parents were unknown, the referee approved the sole goal of adoption. DCS was to check to determine whether Father was in jail. The referee then approved the revised plan on March 7, 2006 in a Decree Note Form. The court made the following notes in the March 2006 decree:

Father is allegedly on the run from assault charges on the mother in violation of electronic monitoring (cut off bracelet). Father was previously dismissed from half-way house for lack of compliance. Whereabouts of both parents are presently unknown.

In February of 2007 the trial court appointed a guardian ad litem. On April 2, 2007 at a permanency plan hearing, the referee noted that despite notice Father failed to appear and that he had been recently released from prison.

In its 2007 petition, the Department asked that Father's parental rights be terminated upon the following grounds:

a) Abandonment by Failure to Visit or Support under Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(i);

b) Abandonment by Failure to Establish a Suitable Home under Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(ii);

c) Substantial Non-Compliance With Permanency Plan under Tenn. Code Ann. § 36-1-113(g)(2); and

d) Persistent Conditions Preventing Return under Tenn. Code Ann. § 36-1-113(g)(3).

While the Department's petition did not expressly reference Tenn. Code Ann. § 36-1-102(1)(A)(iv), the petition alleged the circumstances that satisfy abandonment for wanton disregard under that statute in the petition as follows:

That at the hearing of this cause, Your Honor decree [Father] has willfully abandoned the minor child, [S.H.] for more than four (4) consecutive months prior to his incarceration and/or the filing of this Petition; that his visits with the child have been token visitations as defined by Tenn. Code Ann. § 36-1-102(1)(C); that prior to

-3-

incarceration he engaged in conduct exhibiting a wanton disregard for the welfare of
the child;

In its Final Decree dated July 10, 2007, the court terminated Father's parental rights based
upon abandonment for failure to visit, abandonment for failure to support, abandonment based upon
Father's failure to find a suitable home, failure to comply with the permanency plans, and persistence
of conditions.

Father appeals claiming the Department did not use reasonable efforts to reunite him with
his daughter, that the court erred in finding that statutory grounds existed to terminate his rights, and
that it is not in the best interest of S.H. to have his rights terminated. On appeal, the Department
expressly noted that it does not seek to raise abandonment for failure to visit or abandonment for
failure to support as grounds to support the trial court's decision.[4] Consequently, the grounds for
termination subject to appeal are abandonment for failure to find a suitable home under Tenn. Code
Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(ii), substantial noncompliance with the permanency
plans under Tenn. Code Ann. § 36-1-113(g)(2), and persistence of conditions preventing return
under Tenn. Code Ann. § 36-1-113(g)(3). Additionally, although the trial court made no ruling
under Tenn. Code Ann. § 36-1-102(1)(A)(iv) on the petition's allegations of abandonment by wanton
disregard, it was alleged, and we will consider it.

## I. STANDARD FOR TERMINATION OF PARENTAL RIGHTS

Parents have a fundamental right to the care, custody, and control of their children. *Stanley
v. Illinois,* 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007),
*cert. den.*, 168 L.Ed.2d 729 (2007). However, that right is not absolute and may be terminated in
certain circumstances. *Sandusky v. Kramer,* 455 U.S. 745, 753-54 (1982); *State Dep't of Children's
Services v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). Terminating parental rights has the
legal effect of reducing the parent to the role of a complete stranger and of severing forever all legal
rights and obligations of the parent and of the child; the parent shall have no right thereafter to have
any relationship, legal or otherwise, with the child. Tenn. Code Ann. § 36-1-113(*l*)(1). The United
States Supreme Court has recognized the unique nature of proceedings to terminate parental rights,
stating that "[f]ew consequences of judicial action are so grave as the severance of natural family
ties." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, (1996) (quoting *Sandusky*, 455 U.S. at 787, (Rehnquist,
J., dissenting)).

The statutes on termination of parental rights provide the only authority for a court to
terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004); *In re Tiffany B.*,
228 S.W.3d 148, 155 (Tenn. Ct. App. 2007). Thus, parental rights may be terminated only where
a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d
835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the

---

[4]Apparently there is no four-month period under the relevant time frame where Father was not in jail at least
part of the time. With regard to visitation, Father requested and received some token visitation with S.H.

termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence, that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808-09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "This heightened standard . . . serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A.*, 980 S.W.2d at 622. Due to the significance of the consequences, courts must apply individualized decision-making to a termination decision. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re Tiffany B.*, 228 S.W.3d at 156.

In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546 (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007); *In re Georgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) The burden is on the party seeking to terminate parental rights to present clear and convincing evidence that grounds exist and that termination would serve the best interests of the children. *In re Valentine*, 79 S.W.3d at 546 (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d at 901 n.3.)

The question of whether a statutory ground has been proved by the requisite standard of evidence is a question of law to be reviewed *de novo* with no presumption of correctness. *In re the Adoption of A.M.H.*, 215 S.W.3d at 810 ("As a question of law, the trial court's ruling that the facts of this case sufficiently support the termination ground of willful abandonment are reviewed *de novo* with no presumption of correctness."); *In re Valentine*, 79 S.W.3d at 548 (holding that the question of substantial noncompliance with the requirements of a permanency plan was a question of law reviewed *de novo* with no presumption of correctness).

Consequently, we will review *de novo* with no presumption of correctness the trial court's holding that a ground to terminate was proved by clear and convincing evidence. To the extent the trial court made findings of fact in support of the ultimate conclusion, we review those findings pursuant to Tenn. R. App. P. 13(d), *i.e.*, *de novo* with a presumption of correctness unless the evidence preponderates otherwise. *See In re the Adoption of A.M.H.*, 215 S.W.3d at 808-09; *In re M.L.P.*, 228 S.W.3d at 143-44. In other words, our standard of review will "distinguish between the specific facts found by the trial court and the combined weight of those facts." *In re Tiffany B.*, 228 S.W.3d at 156. A trial court's specific findings of fact are entitled to a presumption of correctness

and must meet the preponderance of the evidence standard, while the court's conclusion that grounds exist to terminate is not entitled to a presumption and must meet the clear and convincing evidence standard. *Id*. at 156. Additionally, "[i]n weighing the preponderance of the evidence, great weight is afforded to the trial court's determinations of witness credibility, which shall not be reversed absent clear and convincing evidence to the contrary." *In re the Adoption of A.M.H.*, 215 S.W.3d at 809.

## II. ANALYSIS

Father's history of arrests and convictions for violent crimes is central to this case. In July of 1990, Father pled guilty to assault with intent to commit first degree murder of a three year old child. The child was in a coma as a result of the assault for several years and ultimately died from his injuries. Father was sentenced to eighteen (18) years and served thirteen (13) on that sentence. He was released in January of 2004. S.H. was born eleven months after Father's release in December of 2004.

The record shows that Father served jail time at various times after the birth of S.H. for assault. Most of those charges arose with regard to Mother. Shortly after being released, Father was re-incarcerated from July 21, 2004 to October 2004 for domestic assault. In December of 2004, Father was in jail for two weeks as a result of assault, resisting arrest, and disorderly conduct. Father was in jail when S.H. was born.

During the year after the 2005 Permanency Plan, Father worked for periods of time when he was not in jail. Father was employed between March and August of 2005 earning $10 per hour. He was in jail for assault between August and October of 2005. In December of 2005, Father briefly resided at a half-way house where a condition of his probation was that he have no contact with Mother. Father's probation was revoked and, consequently, he served a year in jail from February 2006 until February 2007. Later in May of 2007, Father was jailed again on a four-month sentence for assault and resisting arrest. Father was in jail when the hearing was held in this matter in June of 2007. The foregoing litany of incarcerations do not include other times Father was held in jail briefly after being arrested. According to findings by the trial court that are not disputed on appeal, since January of 2004 when he was released after serving his 13 year sentence, Father was incarcerated at least 7 times on charges involving assault upon Mother.

With regard to his guilty plea for assault with intent to commit first degree murder, Father told the trial court that the injury to the three-year old was accidental and that he pled guilty because he was concerned that the child's mother would otherwise lose custody of her other children. The trial court found Father's explanation was not credible. As for the numerous times Father was jailed for assault, Father told the court that they were instances mainly involving domestic disputes with his wife, S.H.'s mother. Father attempted to explain that it was Mother's mental disturbance and not his violent behavior that caused him to be jailed so frequently. Father admitted that he had made no payments towards the support of S.H.

### A) Abandonment

Termination of parental rights on the ground of abandonment is authorized by Tenn. Code Ann. § 36-1-113(g)(1) which refers to the statutory definition of abandonment found in Tenn. Code Ann. § 36-1-102.

The definitions of abandonment pertinent to this case are found in Tenn. Code Ann. § 36-1-102(1)(A)(i) governing support and Tenn. Code Ann. § 36-1-102(1)(A)(ii) governing suitable housing which provide as follows:

(1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

. . .

(ii) The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 36-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardians(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

. . .

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child; or

The Department argues that the trial court correctly terminated Father's parental rights for abandonment as defined in Tenn. Code Ann. § 36-1-102(1)(A)(ii) for failure to establish a suitable home. Father argues that by its terms this definition applies only when the child "is removed from the home of the parent(s) or guardian(s) as the result of a petition." *See In re B.P.C.*, M2006-02084-COA-R3-PT, 2007 WL 1159199, at *7 (Tenn. Ct. App. April 18, 2007) (no Tenn. R. App. P. Rule

11 application filed). Therefore, according to Father, S.H. was not removed from Father's home since S.H. had been in the grandmother's custody and termination of Father's rights may not rest on this ground.

We disagree. The Emergency Order and subsequent actions by the court below show that S.H. was removed from both parents. The record is clear that Father failed to establish a suitable home for S.H. Consequently, we affirm the trial court's termination of Father's rights on this ground.

The Department also argues that Father abandoned S.H. as abandonment is defined in Tenn. Code Ann. § 36-1-102(1)(A)(iv). According to the Department, Father had been in jail eleven of the twelve months preceding the filing of the termination proceeding and "has engaged in conduct prior to incarceration that exhibit a wanton disregard for the welfare of the child."

While the Department alleged in its petition that prior to incarceration Father had exhibited a wanton disregard for the welfare of S.H., the trial court made no ruling on this ground. This court recently made the following observation:

> Tenn. Code Ann. § 36-1-102(1)(A)(iv) also includes an independent test for abandonment based upon a parent's pre-incarceration conduct. *In re Audrey S.*, 182 S.W.3d 838, 870-71 (Tenn. Ct. App. 2005). With regard to that test, [w]e have repeatedly held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.*

*In re J.R.B.*, M2007-00442-COA-R3-PT, 2007 WL 3244637, at *5 (Tenn. Ct. App. Nov. 2, 2007) (no Tenn. R. App. P. 11 application filed).

There is little doubt that based on this record the trial court could have found Father abandoned S.H. under this definition by clear and convincing evidence. We could remand the matter back to the trial court for consideration of this issue.

### B) Substantial Non-Compliance With Permanency Plan

Tennessee Code Annotated § 36-1-113(g)(2) authorizes termination of parental rights for failure to comply with a parenting plan as follows:

> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

The standards for reviewing termination of parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) have been discussed by the Tennessee Supreme Court in *In re Valentine*, 79 S.W.3d 539. Prior to terminating a parent's rights on this ground, the trial court must find that the requirements

of the permanency plan that the parent allegedly did not satisfy are "reasonable and are related to remedying the conditions which necessitate foster care placement." *Id.* at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). If the trial court fails to make this finding, this court must review the trial court's decision *de novo* without a presumption of correctness. *In re Valentine*, 79 S.W.3d at 547.

In order for noncompliance to justify the termination of parental rights, it must be "substantial." In other words, mere technical noncompliance alone is not sufficient to justify the termination of parental rights. *Id.* at 548. Noncompliance with requirements in a permanency plan that are neither reasonable nor related to remedying the conditions that led to the removal of the child from the parent's custody is not relevant for purposes of Tenn. Code Ann. § 36-1-113(g)(2). *In re Valentine*, 79 S.W.3d at 548-49. Additionally, the parent's degree of noncompliance with a reasonable and related requirement must be assessed.

Father does not dispute the trial court's finding that the requirements of the Permanency Plans as they relate to Father are reasonable. Father was to (1) attend parenting class, (2) obtain a parenting assessment, (3) submit to random drug screen, (4) pay child support, (5) complete domestic violence classes, (6) refrain from illegal activity. While Father claims he completed parenting and domestic violence classes, he provided no proof, and his claims were clearly discounted by the trial court. Since his whereabouts were often unknown, there is no evidence one way or the other on the drug screens. There is no question Father was employed for some periods of time yet paid no child support. The record is quite clear that Father was unable to refrain from illegal activity including violence against the mother of S.H. The record clearly supports the trial court's conclusion that Father's noncompliance with the Parenting Plan was substantial.

Father argues that DCS failed in its obligation "to make reasonable efforts to assist Father in the reunification effort. When a child is removed from a parent's custody, the Department is "statutorily required to make reasonable efforts to reunite a family after removing children from their parents' custody." *In re Giorgianna H.*, 205 S.W.3d 508, 518 (Tenn. Ct. App. 2006). These efforts are directed at assisting the parents in remedying the circumstances that caused the removal. The success of a parent's remedial efforts can depend on the Department's assistance and support. *Id.* Therefore, in order to sustain a termination on the ground of persisting conditions, in addition to the elements of Tenn. Code Ann. § 36-1-113(g)(3)(A), the Department must also establish by clear and convincing evidence that it made reasonable efforts to reunite the family. *Id.*

It is not required that the Department's efforts be "herculean" but, on the other hand, the Department must do more than simply provide parents a list of service providers. *Id.* at 519. In this context, the Department's efforts are reasonable "if the Department has exercised 'reasonable care and diligence . . . to provide services related to meeting the needs of the child and the family.'" *Id.*, *citing* Tenn. Code Ann. § 37-1-166(g)(1)(2005).

> The reasonableness of the Department's efforts depends upon the circumstances of the particular case. The factors that courts use to determine the reasonableness of the Department's efforts include: (1) the reasons for separating the parent from his or her children, (2) the parent's physical and mental abilities, (3) the resources available to

the parent, (4) the parent's efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parent's remedial efforts, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts. [citations omitted].

The Department does not have the sole obligation to remedy the conditions that required the removal of children from their parents' custody. When reunification of the family is a goal, the parents share responsibility for addressing these conditions as well. Thus, parents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from their custody.

*Id.* (citations omitted).

Reunification "is a two-way street" such that the Department is not required to accomplish reunification without the assistance of parents. *In re Randall B.*, No. M2006-00055-COA-R3PT, 2006 WL 2792158, at *6 (Tenn. Ct. App. Sept. 28, 2006) (no Tenn. R. App. P. 11 application filed.). Parents must also make reasonable efforts to rehabilitate themselves once services have been made available to them. *Id.*; *see also In re J.L.E.*, No. M2004-02133-COA-R3-PT, 2005 WL 1541862, at *13 (Tenn. Ct. App. June 30, 2005) (no Tenn. R. App. P. 11 application filed).

There is no question that Father repeatedly engaged in violent criminal behavior during the period he was provided under the 2005 Permanency Plan to meet the goals outlined therein. The record is also clear that at various times, his whereabouts were unknown to the Department. It appears from the record that while incarcerated, Father had little problem contacting DCS to request visitation. The DCS employee who testified was the case manager in this matter from the time S.H. came into custody in January 2005 until September 2006. Father was provided information about domestic violence classes by DCS and was provided visitation with S.H. when requested. The record does not show that Father suffered from any mental or physical handicap making it difficult for him to alert DCS to his whereabouts or that he lacked transportation to any service. While not in jail Father was able to find employment. This not a parent who was incapable of making efforts to meet the goals that were set out in the plan. The record clearly supports the conclusion that Father made little to no effort to address the goals in his permanency plan.

Reviewing the factors discussed above including Father's abilities, resources, lack of effort, repeated incarceration and violent behavior, we agree with the trial court that the Department's efforts were reasonable under the circumstances.

### C) Persistence of Conditions

In order to terminate parental rights based upon what is commonly referred to as "persistence of conditions," the following requirements of Tenn. Code Ann. § 36-1-113(g)(3) must be met:

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(i) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

The conditions that led to the removal of S.H. from Father's custody have persisted. Father failed to establish a residence, means to support S.H., and he continued to exhibit violent behavior. The record clearly supports the trial court's findings.

**D) Best Interests**

As we stated above, once any ground for termination has been established, the court must then determine whether the termination of the parent's rights is in the best interest of the child, by clear and convincing evidence. The legislature has given the courts guidance in our efforts to determine the best interest of the child involved, said guidance being in the form of a list of non-exclusive factors which we are instructed to consider:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child;  or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

The trial court discussed each of the factors enumerated above it believed relevant.  The trial court did not, however, expressly rely on subsection (5) regarding the effect on S.H. that a change in caretakers might create.  There is clearly evidence in the record to support the trial court's conclusions that under the factors described in subsections (1), (2), (3), (4), (7), (8), and (9), it is in the best interest of S.H. that Father's rights be terminated.  We believe that the factor in subsection (6) is also applicable due to the assault against Mother.

Father filed a motion with this Court to consider post judgment facts, namely that S.H. had been removed from the care of her foster mother.  We deny the motion since the facts are not the type intended to be covered by Tenn. R. App. P. 14.  Even if it were granted, however, it would not change the conclusion.  The trial court indeed did consider the bond S.H. developed with her foster mother and that her foster mother wished to adopt S.H.  This fact is, however, one of several considered by the trial court.  Under this record, there is clear and convincing evidence that it is in S.H.'s best interest to terminate Father's parental rights regardless of whether S.H. stays with her foster mother or is adopted by her.  S.H. cannot be placed in a stable, permanent home unless Father's rights are terminated.

The trial court is affirmed.  Costs of this appeal are taxed to the appellant, Father, W.H.

_____
PATRICIA J. COTTRELL, JUDGE